UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re: Lewis E. Wilkerson, Jr.,                          Case No. 20-34576-KLP
        Debtor.

Robert E. Dixon,
      Plaintiff,

v.                                                                      Adv. Pro. No. 21-03008-KLP

Lewis E. Wilkerson, Jr.,
      Defendant.

## **MEMORANDUM OPINION**

This matter commenced when Robert E. Dixon (the "Plaintiff" or "Dixon"),

individually and derivatively on behalf of D.E.R. LLC, a Virginia limited liability

company ("DER"), filed a complaint (the "Complaint") against the debtor, Lewis E.

Wilkerson (the "Defendant" or "Wilkerson"), seeking a judgment on behalf of DER

in the amount of $3,844,461 in compensatory damages and $300,000 in punitive

damages and a judgment on his individual behalf in the amount of $8500 in

compensatory damages and $1000 in punitive damages. The Complaint also seeks

a finding that any amounts owed are nondischargeable pursuant to 11

U.S.C. § 524(a)(4) and (6).[1]

---

[1] Wilkerson filed a voluntary petition under Chapter 11 on November 17, 2020, Case No. 20-34576-KLP. An order confirming his Chapter 11 Plan was entered on June 9, 2022 (ECF 234), and provides for the granting of Wilkerson's discharge as of the Plan's Effective Date. Pursuant to 11 U.S.C. § 1141(d)(2), a discharge under chapter 11 does not discharge an individual from any debt excepted from discharge under 11 U.S.C. § 523. In addition to the instant proceeding, Wilkerson has objected to Dixon's proof of claim (Claim No. 33). To the extent that the Court grants judgment in connection with the Complaint that is not excepted from discharge, such judgment shall serve only to establish Wilkerson's liability for purposes of allowance of Dixon's proof of claim

DER was in the business of providing logging transportation services and was owned in equal shares by Dixon and Wilkerson.  There was no written operating agreement for DER, nor did the Articles of Organization name a managing member; however, Dixon and Wilkerson agree that they were the sole members of DER and have stipulated that Wilkerson was its managing member.[2]

The Plaintiff alleges that the Defendant breached his fiduciary duties to DER and committed defalcation by fraudulently failing to collect or by otherwise diverting amounts owed to DER for hauling services DER provided to WST Products LLC ("WST"), an entity owned solely by the Defendant.  The Plaintiff also alleges that the Defendant converted funds, including proceeds received from the sale of equipment owned by DER, and further breached his fiduciary duties by failing to pay "trust funds" for employee income and FICA taxes to the Internal Revenue Service.

The Court conducted a trial via the Zoom platform on May 23, 2022.  As instructed by the Court, the parties filed proposed findings of fact and conclusions of law on July 6, 2022.  The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, Fed.

---

[2] Va. Code § 13.1-1022 provides that "[e]xcept to the extent that the articles of organization or an operating agreement provides in writing for management of a limited liability company by a manager or managers, management of a limited liability company shall be vested in its members." Neither the Articles of Organization nor a written operating agreement provided for the management of DER.  Therefore, DER is a member managed limited liability company.  The Complaint alleges that Wilkerson asserted in the State Court Action (*see* p. 6 *infra*) that a verbal operating agreement and the course of dealing between the members vested Wilkerson with managing the operations of DER. Complaint, ECF 1, ¶6.

R. Civ. P. 52, made applicable by Rule 7052 of the Federal Rules of Bankruptcy

Procedure, Fed. R. Bankr. P. 7052.[3]

## Jurisdiction and Venue

The Court has subject matter jurisdiction over this Adversary Proceeding

pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference from

the United States District Court for the Eastern District of Virginia dated August

15, 1984.  The counts set forth in the Complaint seeking a determination of the

dischargeability of debts constitute core proceedings under 28 U.S.C. § 157(b)(2)(I).[4]

## Factual Findings

On May 6, 2022, the parties jointly submitted the following stipulations of

fact:[5]

1. DER was a Virginia limited liability company, SCC ID 51258161, that was organized by Wilkerson on June 16, 2004.

2. Dixon  and Wilkerson were the owners of DER with each owning a 50% interest.

3. The business of DER was to provide logging transportation services to companies with which Wilkerson, but not Dixon, was affiliated.

4. Dixon did not serve as a manager or managing member of DER.

5. Dixon's principal work for the company was to direct the trucking operations, subject to the overall direction of Wilkerson.

6. Wilkerson was the manager of DER.

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

[4] The Pre-trial Order entered by the Court on April 28, 2021,(ECF 7) required any party not consenting to the entry of a final order by the Bankruptcy Judge to move to withdraw the reference within 30 days; neither party did so.  An Amended Pre-trial Order entered on February 4, 2022 (ECF 37) states that the parties previously consented to the entry of a final order by the Bankruptcy Judge.

[5] ECF 46.

7. Wilkerson controlled all other aspects of the company, including obtaining, buying, and selling equipment, obtaining and disposing of DER's assets, setting prices for DER's transportation services, and controlling all aspects of DER's finances, including federal and state taxation. DER filed its income tax returns via form 1065 and Wilkerson acted as the Partnership Representative for the LLC under 26 U.S.C. § 6223 and previously as the tax matters partner.

8. DER had no written Operating Agreement.

9. Wilkerson assumed overall management and control over DER without discussion or formal agreement and held that authority for as long as DER conducted business.

10. Managers and members who participate in the management of a limited liability company have fiduciary duties to the limited liability company.

11. Wilkerson acting for both DER and his wholly owned company, WST, caused the two entities to contract for DER to provide timber hauling services for WST.

12. No promissory notes or other documentation exists evidencing any loans from Wilkerson and/or WST to DER.

13. Any loans from Wilkerson to DER since the entity's formation in 2004 were capital contributions.

14. On August 30, 2018, Wilkerson sold two DER Western Star cab trucks and some related equipment to Key Truck and Equipment for $133,000 and deposited the sales proceeds check for said amount into his personal account at the Bank of Charlotte County.

15. In the fall of 2018, Wilkerson ordered Dixon to leave the property used by DER as its business premises; and Dixon left and did not return to DER's business premises.

16. DER ceased business operations in December of 2019; and at that time it owned approximately forty (40) timber trailers.

17. At present, DER now owns approximately fifteen (15) timber trailers.

18. In September 2019, Dixon filed suit against Wilkerson to address some of the same issues to be adjudicated in the case at bar in Charlotte County Circuit Court, Case No. CL 19000231-00 (the "State Court Case").

19. Dixon served written discovery in the State Court Case, seeking production *inter alia* from Wilkerson of all payroll records for DER.

20. Wilkerson produced DER's Driver Payroll Records for the period from November 10 through December 22, 2017, for 2018, and for the period from January 1 through December 6, 2019.

21. In response to Dixon's discovery motion, Wilkerson was ordered by the Charlotte County Circuit Court on July 22, 2020, to produce DER's Driver Payroll Records from June 16, 2004, through December 2019 (the "Discovery Order").

22. Wilkerson failed to produce any additional DER Driver Payroll Records in response to the Discovery Order and asserted that he had already produced all DER Driver Payroll Records in his possession.

23. Wilkerson filed for bankruptcy in Bankruptcy Case No. 20-34576-KLP on November 17, 2020.

24. As the person managing DER and controlling its financial affairs, Wilkerson at all times owed DER fiduciary duties including in the handling of all trust funds for income and FICA/Social Security taxes required to be withheld by the LLC from the compensation of its employees and from the LLC's own funds for the employer's share of withholdings for FICA/Social Security.

25. Wilkerson owed DER and the Internal Revenue Service a fiduciary duty to pay over all employee trust funds and not apply these trust funds to any other purposes.

Both parties testified at trial.  Additional witnesses who testified included Cynthia Dixon, the Plaintiff's wife and Defendant's sister, Tanya Futrell, a certified public accountant who testified on behalf of the Plaintiff, and Dawn Wilkerson, the Defendant's wife.  Additional exhibits were admitted to evidence, mostly without

objection.  After hearing and reviewing the testimony of the witnesses and the

exhibits, the Court makes the following findings.

Dixon has known Wilkerson since he was 13 years old (he is now 61), having

been good friends with his parents.  Dixon was and is married to Wilkerson's older

sister, Cynthia Dixon.  Prior to forming DER in 2004, Dixon and Wilkerson worked

together in the logging business.  Dixon had been a partner with Wilkerson in

DER's predecessor, a company named R.E.D.I. LLC.  Dixon and Wilkerson formed

DER in June 2004 after Wilkerson filed a previous bankruptcy.

DER was a part of a logging operation in Keysville, Virginia, that included

two other entities primarily owned and controlled by Wilkerson, W.S.T. Products,

LLC ("WST") (solely owned by Wilkerson) and B.B. & D. Products, LLC ("BB&D")

(owned jointly with his brother, Roland Wilkerson).  The three entities were

interrelated and essentially operated as a single logging business.  WST's purpose

was to obtain the land necessary to provide timber and then sell the harvested

timber.  BB&D cut and loaded the timber.  DER transported the cut timber from

the logging sites to the mills.  The businesses all operated out of the same location.

Maintaining DER as a separate entity was driven, at least in part, by the more

stringent insurance requirements associated with transporting the timber.

Dixon's role was to purchase, repair and maintain all the equipment used in

the logging operation, including DER's and WST's equipment.  Wilkerson primarily

handled the business affairs and finances.  Wilkerson's wife, Dawn Wilkerson,

maintained the books.  Wilkerson's brother, Roland Wilkerson, and Dixon's son
were also involved in the business.

By 2011, the logging operation was doing well enough to purchase new
Kenworth trucks for hauling and "the best pickups on the market" for both Dixon
and Wilkerson.  In 2017, the business purchased Dixon a new GMC Sierra for a
price of $58,000.

In October of 2018, Dixon and Wilkerson had a falling out that resulted in
Dixon leaving the business premises.  Their disagreement stemmed from an
incident in which Wilkerson accused Dixon's son of taking some equipment parts
from the business without permission.  At the same time, Wilkerson complained to
Dixon that the logging operation had suffered losses totaling $5 million.  Dixon also
suspected that Wilkerson had used business proceeds to purchase land, purportedly
for both of them, that he was attempting to keep solely for himself.  Until then,
Dixon had not sought to examine the businesses' financial records, although he had
been aware that funds were being commingled among and between the entities.

In the fall of 2019, Dixon commenced suit in the Charlotte County, Virginia,
Circuit Court against Wilkerson (the "State Court Action") seeking to dissolve DER
and to recover funds on its behalf.  By that time, Dixon was attempting to secure all
the business records of DER, including those dating back to the inception of the
business, so that he could examine DER's finances and determine whether DER had
been properly paid for all its services.

Wilkerson admitted in his testimony that he customarily transferred, or directed Dawn Wilkerson to transfer, funds between the various business accounts, as well as a personal bank account at the Bank of Charlotte, to "keep everyone from going overdrawn."[6] In August of 2018, Wilkerson caused certain DER trucks and trailers to be sold for a price of $133,000[7] and deposited the proceeds into his personal account.  Wilkerson claimed that he had previously advanced personal funds to DER because it needed the money and that he "more than likely" used the $133,000 to buy timber for WST "to keep everybody working."[8]  Wilkerson also testified that he did not pay 2018 and 2019 federal and state tax withholding obligations for DER employees because "I didn't have the money."[9]

Wilkerson also admitted to paying himself $90,000 in January of 2019 to repay unspecified loans that he had made to DER, but he claimed to have subsequently transferred a significant portion of those same funds from his personal account back to DER.[10]  Futrell's uncontradicted testimony was that, according to the QuickBooks account, the $90,000 represented the sale of DER

---

[6] DER's 2018 U.S. Return of Partnership Income (Ex. N), Schedule L, Line 6 reflects outstanding loans to WST and BB&D.
[7] The check for $133,000 from Key Truck and Equipment was dated August 30, 2018, and represented the proceeds from the sale of two Western Star trucks and some trailers owned by DER.
[8] Tr. 59-60 (ECF 59).  Unless otherwise noted, all references to the transcript are to ECF 59.
[9] Tr. 58.
[10] Although Wilkerson stipulated that any funds he advanced to DER were capital contributions, his testimony reflects a lack of understanding of the distinction between loans and capital contributions. The 2018 U.S. Return of Partnership Income, Schedule L, Line 19b includes "Loan from Lewis Wilkerson" in the amount of $914,321 at the end of the year.  In addition, Wilkerson stated that what were originally intended to be loans were subsequently designated as capital contributions because they were not repaid.  Accordingly, the Court rejects this stipulation as being unsupported and contrary to the actual evidence produced at trial.  Wilkerson, however, offered no documentary evidence or specific testimony to support his alleged transfer or repayment of funds from his personal account to DER.

tractors and trailers, was deposited in DER's account and was then transferred to Wilkerson's personal account. Although subsequent transfers from Wilkerson's personal account to DER's account took place, the dates, amounts and purposes of those transfers are unclear.

The parties stipulated that when DER ceased business operations in December 2019, it owned approximately 40 timber trailers and that at present only 15 trailers remain. When asked to address the status of the approximately 25 trailers that are no longer owned by DER, Wilkerson testified that there had not been that many trailers owned, that some trailers were owned by WST rather than DER, and that any proceeds obtained from the disposition of the trailers had gone to the lienholders. No evidence was offered to dispute Wilkerson's explanation.

Most of the funds the Plaintiff contends were diverted from DER stemmed from hauling trips for which there was no record of payment having been received. The amounts claimed were calculated by comparing driver payroll records to freight records showing that drivers had been compensated for hauling loads for which DER did not receive payment.

Dixon obtained some, but not all, driver payroll records through discovery in the State Court Action. Records that were produced include driver payroll records from November 10, 2017, through December 12, 2017, all of 2018 and from January 1, 2019, through December 6, 2019.[11] Futrell, the accountant employed by Dixon,

---

[11] Plaintiff sought to obtain all the driver payroll records for DER from 2012 through 2019 by serving discovery on the Defendant in the State Court Action; however, none other than those produced by Defendant for the years 2017-2019 were obtained. Defendant's failure to produce the remaining driver payroll records was the subject of a motion to compel in the State Court Action; however,

analyzed the DER driver payroll records and compared them to the WST freight

payment records to determine whether drivers had been paid for hauling trips for

which DER did not receive corresponding payments from WST.  Futrell determined

that DER's drivers made 55 hauling trips from November 9, 2017, through

December 22, 2017, for which DER was not paid.  She determined that during 2018,

DER's drivers made 1313 trips for which DER was not paid.  She also determined

that from January 1, 2019, through December 9, 2019, DER's drivers made 695

hauling trips for which DER did not receive payment.  The combined number of

trips that Futrell was able to determine had been made by DER's drivers for which

DER had not been paid totaled 2063.

 Futrell then applied the various rates DER received for similar hauling trips

to those for which DER was not paid to determine the total amount that was owed,

but not received.  She calculated the total to be $485,408.

 Because she had no driver payroll records for the periods prior to November

9, 2017, Futrell was unable to compare driver payroll records to freight payment

records for the period from 2012 through all of 2017.  Instead, Futrell created an

estimate of the number of hauling trips for which payment was presumably not

received by extrapolating those numbers based on the assumption that the same

percentage of unpaid trips occurred during the period from 2012 to 2017 that

---

before the discovery dispute could be fully resolved, Wilkerson filed bankruptcy.  The State Court
Action was stayed as a result of Wilkerson's bankruptcy filing.  The Plaintiff did not seek relief from
the automatic stay to resume the State Court Action, opting instead to commence the instant
Adversary Proceeding.  There is no indication in the record that the Plaintiff sought production of
any documents in this adversary proceeding that were not produced by the Defendant.  No motion to
compel the production of documents nor any other discovery motion was filed in this action.

occurred during the period for which Futrell did have the necessary records.  Using this methodology, Futrell determined that DER had not been paid a total of $1,927,709 for hauling trips that occurred between 2012 and 2017.

Futrell also testified to numerous altered transactions in DER's QuickBooks accounting records.  In multiple cases, transactions originally booked as freight income were changed to loan transactions between DER and WST.  Other transactions were deleted for reasons that Futrell was unable to determine.  Futrell noted numerous transfers of funds between the bank accounts for the three business entities and Wilkerson's personal account for which she could discern no basis.  Dawn Wilkerson, DER's bookkeeper, was unable to fully recall and explain the deletions and alterations to the QuickBooks account and admitted that some of the transfers from the business accounts to her husband's personal account were made at his direction.

The evidence establishes that despite the existence of separate LLCs, the logging operation was conducted as if it were a single business.  Funds were transferred between the entities' bank accounts as needed to pay obligations owed at the time without regard to corporate formalities or appropriate book entries. Transfers took place between business accounts and Wilkerson's personal bank account, again without corporate formalities and proper book entries.  Neither party offered a forensic analysis of receipts, disbursements, receivables or payables.  Since this was a family owned and operated business, prior to the falling out between Dixon and Wilkerson, no one involved found fault with or complained about how the

business was conducted.  Dixon, who was aware of Wilkerson's practice of

commingling funds,[12] condoned Wilkerson's methods, or at least failed to raise any

concerns, until he quarreled with Wilkerson in 2018 after the business began

failing.

In the schedules filed in his individual bankruptcy case,[13] Wilkerson listed

numerous business debts but failed to list DER as a codebtor, despite

acknowledging that substantial amounts were owed to the Internal Revenue Service

and the Virginia Department of Taxation as a result of DER's failure to pay

withholding taxes for 2018 and 2019.  Wilkerson was designated to be a responsible

party by the taxing authorities.  Numerous deficiency claims resulting from the sale

of tractors and other equipment by lienholders leaving unpaid balances were listed

in Wilkerson's schedules; again, DER was not listed as a codebtor though it is

uncontested that DER was the entity that owned and operated the timber hauling

business.  While many of the proofs of claim filed in Wilkerson's bankruptcy case

are claims against WST that were guaranteed by Wilkerson, at least one creditor

listed its primary obligor as DER.[14]

On June 9, 2022, an order was entered in Wilkerson's bankruptcy case

confirming his Chapter 11 Plan of Reorganization (the "Plan").[15]  The Internal

---

[12] At trial, Dixon testified:  "Dawn always told us, when we done anything, that everything come out of one pot . . . . It was just - - it was run like one company."  Tr: p. 37, lines 16-22.
[13] Case No. 20-34576-KLP.  "The Court can take judicial notice of its own records.  *In re Heilig-Meyers Co.*, 328 B.R. 471, 488-89 (E.D. Va. 2005); *In re Rivera*, No. 13-14351-BFK, 2014 WL 287517, at *2 n.2 (Bankr. E.D. Va. Jan. 27, 2014); *In re Ryan*, 472 B.R. 714, 727-28 (Bankr. E.D. Va. 2012)."  *In re Cheeks*, No. 19-10516-BFK, 2019 WL 3805990, at *4 n.4 (Bankr. E.D. Va. Aug. 13, 2019).
[14] Mercedes-Benz Finance Services, Claim No. 12, in the amount of $31,462.71.
[15] Case No. 20-34576-KLP, ECF 234.

Revenue Service filed a proof of claim in Wilkerson's bankruptcy case; the Virginia

Department of Taxation did not.  The Plan treats the secured and priority claim of

the Internal Revenue Service in the amount of $433,514.21 as entitled to priority

under 11 U.S.C. § 507 and provides for payment in full.  The Plan does not provide

for payment of amounts due to the Virginia Department of Taxation in connection

with 2018 and 2019 withholding tax obligations.

Dixon seeks an award of $201,961.86 in connection with Wilkerson's failure

to pay IRS trust funds, as evidenced by notices of tax liens against DER that were

filed as an exhibit to the Complaint.  Dixon does not seek a recovery in connection

with amounts due for Virginia Department of Taxation trust funds related to 2018

and 2019, although the evidence demonstrates that the Virginia Department of

Taxation filed liens in the property records for withholding taxes for 2018 and 2019

in the approximate amount of $25,000 against both Dixon and Wilkerson.  The

Complaint included a reservation to include additional amounts in its request for

damages as "justified by the evidence."[16]  Although the Plaintiff made no motion

during or after the trial to amend the Plaintiff's damage claim, the Plaintiff's

Proposed Findings of Fact and Conclusions of Law include the $25,000 amount

related to the Virginia Department of Taxation in its request for damages.

## Conclusions of Law

### *The Direct Claims*

---

[16] Complaint, ECF 1, p. 9

The Court will first address Dixon's direct claims, contained in Count II of the Complaint, because they may be disposed of summarily.  In Count II,  Dixon alleges that Wilkerson "committed larceny" or converted certain items owned by Dixon including a chisel plow valued at $4000, a hay rake valued at $1500, and a 2003 GMC pickup truck valued at $3000.[17]

Dixon's direct claims fail because he presented no evidence whatsoever to support any aspect of the claim, an omission acknowledged by his attorney.[18]  Since the evidentiary burden is on the Plaintiff to prove his claim by a preponderance of the evidence, the failure to present any evidence to establish the claim is fatal.

The Complaint suggests that DER may have had an interest in the pickup truck.  To the extent that DER had an ownership interest in the pickup truck, even if Dixon were to have standing to bring a derivative claim on behalf of DER, his failure to present any evidence to support this allegation likewise mandates finding in favor of the Defendant.  For this reason, Count II of the Complaint will be dismissed with prejudice.

*The Derivative Claims*

Count I of the Complaint is a derivative action brought on behalf of DER by Dixon, who co-owned the entity with Wilkerson.  Dixon alleges that he is the appropriate person to assert the claim "because he remains a member of D.E.R. and

---

[17] It is apparent from the face of the Complaint that Dixon has some doubt about his ownership of the GMC pickup because he included a request to pursue the claim derivatively in the event it were to be determined that DER had an ownership interest.

[18] At closing arguments, counsel for Dixon stated:  "As the Court probably noted, we didn't present any evidence on the much smaller claim that Mr. Dixon had for some tools and things like that today."  Tr. 145, lines 19-21.

he was a member at the times of the transactions as to which he here complains."[19]

Virginia's Limited Liability Company Act, Va. Code §§ 13.1-1000, *et seq*., provides

that "[a] member of a limited liability company, solely by reason of being a member,

is not a proper party to a proceeding by or against a limited liability company,

except where (i) the object is to enforce a member's right against or liability to the

limited liability company or (ii) as provided in Article 8 (§13.1-1042 et seq.) of this

chapter."  Va. Code §13.1-1020.  The purpose of the derivative claim is not to enforce

Dixon's right against or liability to DER.  Thus, to pursue a claim on behalf of DER,

Dixon must satisfy the requirements of Article 8 of the Limited Liability Company

Act.

Virginia Code § 13.1-1042 requires that a written demand first be made upon

the LLC to pursue a cause of action before authority exists to commence a

derivative action.  If there is no response within 90 days after demand is made, a

derivative suit may be filed.  Dixon made no such demand before filing either the

Complaint or, apparently, the State Court Action but contends that it would be

futile to make a demand because Wilkerson, as the manager of DER, would likely

be unwilling to pursue a claim on behalf of the LLC against himself.  In *Davis v.*

*MKR Development, LLC*, 814 S.E.2d 179 (2018), the Supreme Court of Virginia

upheld the futility exception to the demand requirement of §13.1-1042 and

concluded that the Virginia General Assembly did not abolish the futility exception

when it amended § 13.1-1042 in 2011.

---

[19] Complaint, ECF 1, ¶4.

The Court agrees that the futility exception is applicable here. Although the parties are both members of the LLC, it is undisputed that Wilkerson managed the financial affairs of DER. As the intended target of the action, it is reasonable to assume that a demand upon Wilkerson to pursue a claim on behalf of DER against himself would be useless.[20]

Although Wilkerson has not challenged Dixon's standing to bring a derivative action,[21] the Court has concerns about his intentions going forward.

---

[20] Va. Code § 13.1-1044 includes a pleading requirement that "the complaint shall set forth with particularity the effort of the plaintiff to secure commencement of the action by a member or manager with the authority to do so or the reason for not making the effort." The Complaint in this case advances the futility exception as the explanation for not making an effort to persuade Wilkerson to initiate a derivative action, Complaint, ECF 1, ¶¶10-11, and therefore meets the statutory requirements. Rule 23.1 of the Federal Rules of Civil Procedure, made applicable by Rule 7023.1 of the Bankruptcy Rules, contains similar pleading requirements to those required under § 13.1-1044, but adds an additional requirement that the complaint be verified. *See* Bankruptcy Rule 7023.1(b), Fed. R. Bankr. P. 7023.1(b). The Complaint is not verified; however, Dixon has not moved to dismiss the Complaint, nor has he raised any objection or defense based on this omission.
[21] Wilkerson has not objected to Dixon's being the proper party to bring the derivative action. Va. Code § 13.1-1043 requires the plaintiff to be a member of the LLC at the time of bringing the action and to have been a member at the time the alleged improper transactions took place. The evidence is that Dixon maintained his membership interest when the transactions complained of took place and through the time this action was commenced. Rule 23.1 of the Federal Rules of Civil Procedure, made applicable by Fed. R. Bankr. P. 7023, provides that "[t]he derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association."

The Court notes that, aside from Dixon's efforts through his allegations and testimony to distance himself from the management of DER, there is nothing in the Articles of Incorporation or any written operating agreement that would have precluded either Wilkerson or Dixon, as each was a member and equal owner, from acting on behalf of DER. In fact, pursuant to Va. Code § 13.1-1040.1(6)(a), Wilkerson's bankruptcy filing dissociated him from the LLC, removing him from management and presumably paving the way for Dixon to assume control. *See* Va. Code § 13.1-1039 (providing that assignees of membership interests, who are deemed to have an interest equivalent to a dissociated member, have no management rights). Moreover, pursuant to Va. Code §13.1-1050.2, the cancellation of an LLC such as DER for failure to pay its annual registration fee, as alleged in the Complaint (ECF 1, p.1), automatically vests its members as trustees in liquidation with the responsibility for liquidating its business and affairs. *See* Va. Code § 13.1-1050.2 ("The properties and affairs of a limited liability company whose existence has been canceled . . . shall pass automatically to its . . . members . . . as trustees in liquidation. The trustees shall then proceed to (i) collect the assets of the limited liability company; (ii) sell, convey, and dispose of such of its properties  as are not to be distributed in kind to its members;  (iii) pay, satisfy and discharge its liabilities and obligations; and (iv) do all other acts required to liquidate its business and affairs.").

Nevertheless, there apparently being no other qualified volunteer available to pursue a claim on behalf of DER, the Court will recognize Dixon's standing but will also reiterate certain statutory requirements on him that will be addressed below.

Turning to the allegations of impropriety contained in Count I of the Complaint, the parties have stipulated that Wilkerson, as manager of DER, owed fiduciary duties to the entity.[22]  This Court has recognized that "[m]embers in member-managed LLC's, and managers in manager-managed LLC's, have fiduciary obligations."  *The Credit Experts, LLC. v. Santos* (*In re Santos*), Case No. 11-17789-BFK, 2012 WL 2564366, *5 (Bankr. E.D. Va. July 2, 2012), citing *Gowin v. Granite Depot, LLC*, 272 Va. 246, 634 S.E.2d 714 (2006) (managing member had fiduciary duties to LLC);  *Flippo v. CSC Assoc. III, L.L.C.,* 262 Va. 48, 56-57, 547 S.E.2d 216, 221-22 (2001) (managing member of limited liability company has fiduciary duties similar to those of a corporate director).  *See also* Va. Code § 13.1-1024.1 ("[a] manager shall discharge his or its duties as a manager in accordance with the

---

*See also* Va. Code § 13.1-1046 (requiring a limited liability company to dissolve and wind up its affairs upon the automatic cancellation of its existence pursuant to § 13.1-1050.2).  Inasmuch as DER ceased business operations in December 2019 (ECF 34, ¶ 16) and Wilkerson, having filed bankruptcy, is no longer authorized to participate in the management and affairs of DER, it appears that Dixon, as the sole remaining member having authority to manage, assumes responsibility for liquidating DER and using the proceeds to pay DER's creditors.

The Court also notes that some courts have held that a derivative claim would not be permitted without some action to revoke the cancellation.  *See, e.g., Metro Commc'n Corp. BVI v. Advanced Mobilcomm Techs. Inc.*, 854 A.2d 121, 138 (Del. Ch. 2004).  Again, the Defendant has raised no issues concerning Dixon's standing or the ramifications of the alleged cancellation of DER.

[22] In paragraph 14 of the Complaint, the Plaintiff alleges, and the Defendant admits, that "managers have fiduciary duties to the entity."  Stipulation No. 10 simply states, again, that "[m]anagers and members who participate in the management of a limited liability company have fiduciary duties to the limited liability company."  Although these statements may be correct in a general sense, both the admission and the stipulation are statements of the law, at least when defining the nature and extent of Wilkerson's fiduciary duties and the implications of any breach.  While the parties may agree on points of law, the Court is not bound by their interpretation.

manager's good faith business judgment of the best interests of the limited liability company.").

"To establish a claim for breach of a fiduciary duty, a plaintiff must establish three elements: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) subsequent damages attributable to the breach." *& T ex rel. Battaglia v. Knight*, 68 F.Supp.3d 579, 586 (E.D. Va. 2014). The parties agree that Wilkerson was the manager of DER.[23] They also agree that he owed a fiduciary duty to DER. The scope of Wilkerson's fiduciary duties to DER, and to what extent he may have breached those duties, is in dispute.

The largest component of the derivative claim stems from the alleged failure on the part of Wilkerson to collect receivables owed to DER by WST, Wilkerson's wholly owned affiliate of DER. DER provided hauling services to WST for which WST agreed to pay DER. Dixon contends that Wilkerson breached his fiduciary duty to DER by failing to cause WST to pay DER for those services. The evidence to support this claim consists of an analysis prepared by Futrell that demonstrates that for the later part of 2017 through the first week of December 2019, DER made multiple hauling trips for WST for which receipt of payment is not reflected in the business records.

Records of DER that would presumably reflect whether DER was paid for all hauling services for WST for years prior to late 2017 were not offered into evidence

---

[23] Stipulation, ECF 46, No. 6.

nor were they provided to Futrell.[24]  The analysis prepared by Futrell attempts to

overcome this lack of data by extrapolating conclusions based on the data contained

in the records that were available.  Futrell computed the percentage of unpaid trips

for the years for which records were available and applied this percentage to the

gross receipts reflected by DER's tax returns for the years that DER operated prior

to late 2017 to determine the number of unpaid trips in years for which she did not

have DER's records.

The claim for unpaid hauling services is based on certain premises that

Dixon apparently assumes are evident despite the lack of any evidence or

foundation.  The most obvious is the assumption that if WST failed to pay DER for

one or more hauling trips, it was due solely to Wilkerson's failure to act in the best

interests of DER.  This presupposes that WST always had the funds necessary to

pay DER in full and that Wilkerson instead wrongfully diverted those funds away

from DER.  The evidence offered at trial does not support this conclusion.  Dixon

presented no forensic analysis nor any other evidence that identifies actual funds

that were available to pay DER for hauling trips and were instead diverted by

---

[24] Dixon makes much of the alleged failure of Wilkerson to comply with his discovery requests in the
State Court Action.  The state court did not render a final decision in connection with Dixon's motion
to compel Wilkerson to produce all the driver payroll records requested by Dixon.  Nevertheless,
Dixon suggests that this Court should punish Wilkerson for his alleged discovery deficiencies in the
State Court Action by permitting him to establish his claim through an analysis that is based on the
unlikely assumption that the percentage of hauling trips for which DER did not receive payment
from WST from late 2017 through 2019 (when the logging operation was failing) would have been
the same as between 2014 through most of 2017 (when the logging operation was doing well enough
to purchase expensive personal vehicles for Dixon and Wilkerson).  Perhaps, had Dixon continued in
state court, he may have succeeded in obtaining sanctions against Wilkerson in connection with his
alleged discovery failures.  Instead, Dixon chose to abandon the State Court Action and initiate a
new lawsuit in this Court.  There being no discovery motions filed in this action, there is no basis to
sanction Wilkerson nor any reason to excuse Dixon's failure to submit the evidence necessary to
support Futrell's analysis.

Wilkerson, whether or not for his own benefit.  *See, e.g., Rwanda v. Uwimana* (*In re Uwimana*), 274 F.3d 806, 812 (4th Cir. 2001) (distinguishing the expenditure of a principal's funds to benefit the  fiduciary from using the funds for proper expenditures benefitting the principal).

The only evidence of WST's assets and liabilities that may be gleaned from the record indicates that WST's financial problems mirrored those of DER.  The claims register in Wilkerson's bankruptcy case includes numerous claims seeking to enforce Wilkerson's guarantee of WST debts.  This is consistent with Wilkerson's testimony that the logging operation was treated as one business in an effort to "keep everybody working."  When DER was having financial difficulties, so was the rest of the logging operation, including WST.

Another premise necessary to support Dixon's claim is that the percentage of unpaid hauling trips for the period for which DER's records weren't available would have been the same as the percentage of unpaid hauling trips for the period for which records were available.  Dixon has presented no evidence to support this assumption.  Since the evidence indicates that DER, and the logging operation in general, was more financially secure in its earlier years, a more reasonable assumption would be that in those earlier years DER would have had fewer trips for which it was not paid by WST.  Damages related to the pre-late 2017 claim would be speculative, at best.

The derivative claim related to unpaid hauling services fails because Dixon has not carried his burden of proving that Wilkerson breached his fiduciary duty to

DER.[25]  A business's failure to collect full payment from another business,

particularly one that is struggling financially, does not in itself establish that the

manager of the business providing the services breached his fiduciary duty to that

business simply by virtue of his also being the manager of the business that failed

to make full payment.  Something more is required to prove a breach of the

manager's fiduciary duty.[26]

Even if Dixon were able to carry his burden of proof with respect to

establishing a breach of fiduciary duty by Wilkerson in failing to collect amounts

due to DER by WST, the evidence would be insufficient to establish that the debt is

nondischargeable.  Dixon contends that Wilkerson committed defalcation while

acting in a fiduciary capacity and, therefore, the debt should be excepted from

discharge pursuant to 11 U.S.C. § 523(a)(4).  Wilkerson stipulated that he had a

fiduciary duty to DER but did not stipulate that he was acting in a fiduciary

capacity within the meaning of § 523(a)(4).  Although the parties may believe the

meaning of "fiduciary" is the same when pursuing an objection to the discharge of

debts under Bankruptcy Code § 523(a)(4) as it is when pursuing a claim for breach

---

[25] Va. Code § 13.1-1024.1, which requires a manager of a limited liability company to exercise good faith business judgment of the best interests of the limited liability company, provides that "a person alleging a violation of this section has the burden of proving the violation."

[26] Dixon points to the evidence that certain QuickBooks (the accounting system used by DER) transactions were subsequently deleted or modified, at times to reflect loan transactions between DER, WST, and Wilkerson.  The QuickBooks changes were made by Dawn Wilkerson, on occasion at her husband's direction.  Futrell was unable to determine why some transactions were changed from freight income received from WST to loans received from WST or Wilkerson.  Dixon contends that the changes to the accounting records are indicative of fraud.  No doubt, the transfer of funds between DER and WST without appropriate documentation were improper, at least from an accounting perspective; however, the case laid out by Dixon fails to connect either the commingling of funds or the altered QuickBooks transactions to actual missing funds, aside from the $133,000 check received from Key Truck and Equipment and a payment of $90,000 from DER to Wilkerson that the Court has separately addressed.

of fiduciary duty under state law, it is not the same.  Bankruptcy law controls who

is a fiduciary for the purposes of § 523(a)(4).

In two recent, comprehensive opinions, Judge St. John of this Court discussed

the elements necessary to establish liability in the Fourth Circuit under § 523(a)(4)

for defalcation while acting in a fiduciary capacity.  In *Com. Cash Flow, L.L.C. v.*

*Matkins* (*In re Matkins*), 605 B.R. 62 (Bankr. E.D. Va. 2019), Judge St. John

explained that a contractual relationship alone is not sufficient to establish a

fiduciary relationship but that the intent to create an express trust may establish a

fiduciary relationship.  *Id.* at 100.  In *Matkins,* an express trust was created because

the factoring agreement in question provided for the creditor's exclusive ownership

of certain proceeds, the inability of the fiduciary to use the proceeds for its own

purposes, and the proceeds were required to be separately maintained.  *Id.* at 103-

04.

Approximately one year later, in *James River Petroleum, Inc. v. Dickson* (*In*

*re Dickson*), Case No. 19-70934-SCS, 2020 WL 6877150 (Bankr. E.D. Va. Sept. 29,

2020), Judge St. John reiterated the requirements necessary to create a fiduciary

relationship under §523(a)(4), relying upon the Fourth Circuit's analysis in *Kubota*

*Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493(4th Cir. 2008), and the Eastern

District of Virginia case of *Racetrac Petroleum, Inc. v. Khan (In re Khan),* 461 B.R.

343, 348 (E.D. Va. 2011).  In *Strack*, he found that an express trust and a resulting

fiduciary relationship existed between a petroleum products supplier and a

convenience store operator when the underlying consignment contract provided that

the supplier retained title to the petroleum products and related proceeds. The operator was not permitted to utilize the proceeds and instead was required to deposit the proceeds into the supplier's bank account daily. *Id*. at *21.

Neither the existence of an express trust nor a requirement to segregate funds has been shown to exist in this case. Dixon has not established that Wilkerson was acting in a fiduciary capacity in any way for the purpose of applying §523(a)(4). *See also KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 629 (Bankr. E.D. Va.2001) (holding that manager of limited liability company did not owe fiduciary obligation sufficient to trigger §523(a)(4) because Virginia law regarding the duties of a manager did not "impose any trust upon funds contributed to a limited liability company for capital or otherwise" or "address the relationship between a manager and the monies of a limited liability company.").

In addition to his failure to establish that Wilkerson was a fiduciary for purposes of § 523(a)(4), Dixon has failed to demonstrate that Wilkerson committed defalcation. In *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013), the Supreme Court held that defalcation requires *scienter*. "Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong." *Id*.

The court in *Flora v. Tagliaferri* correctly articulated the post-*Bullock* definition of defalcation as requiring "'a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase' such as fraud, embezzlement, and larceny." *Flora v. Tagliaferri* (*In re Tagliaferri*),

619 B.R. 141, 146 (Bankr. N.D. W.Va. 2020), quoting *Bullock* at 269.[27]  The court

further instructed that:

> Resolving a circuit split in 2013, the Supreme Court articulated
> that (sic) term "defalcation" in § 523(a)(4) includes a heightened
> culpable state of mind requirement "involving knowledge of, or
> gross recklessness in respect to, the improper nature of the
> relevant fiduciary behavior." *Bullock*, 569 U.S. at 269, 133 S.Ct.
> 1754.  According to *Bullock*, "where the conduct at issue does not
> involve bad faith, moral turpitude, or other immoral conduct, the
> term [defalcation] requires an intentional wrong." *Id.* at 273,
> 133 S.Ct. 1754.   An intentional wrong encompasses conduct
> which the fiduciary knows is improper, as well as reckless
> conduct, such as when a fiduciary "consciously disregards (or is
> willfully blind to) a substantial and unjustifiable risk" that his
> conduct will result in a breach of fiduciary duty.  *Id.* at 273-74,
> 133 S.Ct. 1754.

*In re Tagliaferri*, 619 B.R. 141, 147 (Bankr. N.D. W.Va. 2020).

Dixon has failed to establish, or even offer evidence of, Wilkerson's state of

mind at the time of his alleged failure to collect funds owed by WST.  Wilkerson

testified that his management of the logging operation required transferring funds

between the three operating entities "to keep everyone working."  While the Court

does not condone the parties' failure to properly treat the three limited liability

companies as  separate entities, and to properly document intercompany

transactions, these omissions alone do not establish the necessary bad faith

requirement.  Dixon's failure to demonstrate the "culpable state of mind" required

---

[27] The Fourth Circuit's decision in *Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir.2001), a case relied upon by the Plaintiff, defined defalcation "'as the failure to meet an obligation' or 'a nonfraudulent default'" and found that a "failure to account is sufficient."  *Uwimana* was decided before the Supreme Court, in *Bullock,* added a state of mind requirement to prove defalcation.  *See Tagliaferri,* 619 B.R. at 148 ("[t]he Plaintiff mistakenly relies on the outdated *In re Uwimana* standard which merely required negligence or a mistake.").

by *Bullock* would prevent the Court from finding that Wilkerson committed

defalcation while acting in a fiduciary capacity.  *See Chavis v. Mangrum* (*In re*

*Mangrum*), 599 B.R. 868, 879-80 (Bankr. E.D. Va. 2019)8 ("Chavis has failed to

establish by a preponderance of the evidence that Mangrum committed defalcation

as defined by §523(a)(4) and interpreted by the Supreme Court in *Bullock*.  The

Court believes that Mangrum is the exact type of nonprofessional fiduciary the

Supreme Court had in mind when it imposed the heightened mental state standard

in *Bullock*.").

The evidence related to the check for $133,000 received from Key Truck and

Equipment in August of 2018 in exchange for the sale of DER tractors and trailers

is another matter, as is the payment of $90,000 from DER to Wilkerson in January

of 2019.  In both instances, the evidence establishes that Wilkerson diverted DER

funds directly to himself.  In neither case did Wilkerson offer any evidence

indicating that the funds he received subsequently benefitted either DER or the

overall logging operation.  Although Wilkerson contends that he was repaying

himself loans he made to DER, he offered no evidence of any specific transfer of

funds to DER to support his contention that he made any loans to DER other than

his testimony that he had made unspecified loans in various amounts to DER and

DER's tax returns that reflect that Wilkerson had loans outstanding to DER.[28]  He

---

[28] *See* DER's 2018 federal tax return, Form 1065, U.S. Return of Partnership Income (Ex. N), an
exhibit offered by Wilkerson.  Schedule L of the 2018 return, Line 19B- "Mortgages, Notes,
Payable in 1 Yr or more," includes an itemization that shows "Loan from Lewis Wilkerson" of
$728,021 at the beginning of the year and $914,321 at the end of the year.  Wilkerson did not offer
DER's 2019 federal tax return; however, the 2019 Form 1065, U.S. Return of Partnership Income
(Ex. 1), was submitted by Dixon.  The 2019 return provides a total for Schedule L, Line 19B-
"Mortgages, Notes, Bonds Payable in 1 Yr or more" but (by intent or otherwise) does not include the

offered no details, contemporaneous paperwork, cancelled checks or any specifics
evidencing any particular loan.

The Plaintiff having established a *prima facie* case with respect to these
payments, it was incumbent upon Wilkerson to offer a valid explanation for his
having paid himself these funds at a time when the business was unable to pay its
trade creditors.  He has failed to do so.[29]  For those reasons, the Court finds that
Wilkerson breached his fiduciary duty to DER by diverting those funds to himself.

Another component of the derivative claim arises from the alleged
disappearance of the proceeds from the sale of 25 trailers owned by DER after
Dixon left the business in the fall of 2018.  The parties stipulated that DER owned
"approximately 40 timber trailers" in December of 2019[30] and that at the time of the
trial there were "approximately" 15 remaining.[31] When asked to account for the 25

---

itemization that that accompanied the 2018 return; nevertheless, the total indebtedness on Line 19B
increased from the 2018 totals.  Moreover, Exhibit 1 included DER's financial statement for the
period ending December 31, 2019, and included "Loan from Lewis Wilkerson [in the amount of]
$1,100,285.24."  While one may surmise that Wilkerson loaned DER substantial sums during 2018
and 2019, that, coupled with Wilkerson's vague testimony, does not provide a sufficient basis for the
Court to conclude that Wilkerson has met his burden of proving that the payment of $90,000 to
himself in January, 2019, was the repayment of a loan or, if it was, that paying himself instead of
paying tax withholding obligations and other third party debts of DER at a time that the business
was struggling did not breach his obligation as manager to discharge his duties in accordance with
his good faith business judgment of DER's best interests. The 2019 federal tax return for DER
reflects a loss of ordinary income of $273,103.  Wilkerson offered no explanation, reasonable or
otherwise, as to why he chose to prefer himself over non-insiders.
[29] Wilkerson testified that the $133,000 was "more than likely" used to buy timber for WST in order
to "keep everybody working," yet the check from Key Truck and Equipment was deposited into his
personal account.  Tr. 59-60.  He offered no evidence to support his supposition that the funds were
used to purchase timber.  The Court finds that Wilkerson failed to adequately rebut Dixon's *prima
facie* case that he breached his fiduciary duty by diverting these proceeds to himself.  As for the
$90,000 transfer, Wilkerson's only explanation was "I had put a lot of money in D.E.R., and I was
getting some of it back."  Tr. 62, lines 11-12.  Again, the Court finds Wilkerson's evidence to be
insufficient to rebut Dixon's *prima facie* case.
[30] Stipulation, No. 16, ECF 46.
[31] Stipulation, No. 17, ECF 46.

trailers that were no longer on the business premises, Wilkerson testified that some

of the trailers actually belonged to WST rather than DER, that proceeds from

selling the trailers went to lienholders and that he couldn't remember whether any

net proceeds were received.  Dixon offered no evidence to rebut Wilkerson's

testimony.  In fact, no evidence concerning the liquidation of the trailers or the

disposition of the proceeds was offered at trial.  In his proposed Findings of Fact

and Conclusions of Law, Dixon does not even seek a recovery for DER in connection

with the trailers.  The Court is left with no alternative other than to disregard this

component of Dixon's claim.[32]

The Complaint includes an allegation that Dixon, as manager of DER, failed

to pay funds withheld from employee pay to the Internal Revenue Service and the

Virginia Department of Taxation in violation of his fiduciary duty to DER.  Dixon,

on behalf of DER, seeks an award of damages in the amount of $201,961.86, as

evidenced by copies of Notices of Federal Lien attached to the Complaint and

$25,000 owed to the Virginia Department of Taxation as evidenced by the Notice of

State Tax Lien.[33]  The Complaint describes Dixon's failure to pay the tax

withholdings as "defalcation while acting in a fiduciary capacity . . . and larceny and

---

[32] The Complaint alleges that "Wilkerson took the funds of those sales (estimated at a per trailer value of $12,500 for a gross figure of $312,500) for his own use and benefit in breach of his fiduciary duties to D.E.R."  Complaint, ECF 1, ¶21.  For reasons unexplained, Dixon allowed this serious allegation to remain but offered no evidence to support it.  The Court would suggest that in the future, Dixon and his attorneys be mindful of the principle of Chekhov's gun-- *"If you say in the first chapter that there is a rifle hanging on the wall, in the second or third chapter it absolutely must go off.  If it's not going to be fired, it shouldn't be hanging there."*  Anton Chekhov. (From S. Shchukin, Memoirs, 1911, as quoted in https://www.writingclasses.com/toolbox/ask-writer/whats-this-business-about-chekhovs-gun.)

[33] Plaintiff's Ex. 17.

embezzlement . . . as well as a willful and malicious injury by Wilkerson to D.E.R."[34]
Wilkerson testified that the taxing authorities were not paid because DER "didn't
have the money."[35]

Wilkerson's personal liability for the trust fund tax obligations to the Internal
Revenue Service is not in dispute.  He accepted liability to the Internal Revenue
Service for DER's 2018 and 2019 tax withholding obligation through his confirmed
Plan.  The Plan provides for full payment to the Internal Revenue Service as a
priority debt.[36]  Nevertheless, Dixon, seeks to have Wilkerson remain liable,
pursuant to 11 U.S.C.§ 523(a)(4), not only to the taxing authorities but also to DER
for the unpaid withholding taxes.

Dixon has failed to point to a case where a court has denied a discharge of a
tax withholding obligation of a responsible party pursuant to § 523(a)(4) of the
Bankruptcy Code.  Contests over such liability typically arise in the context of an
objection to a proof of claim filed by the taxing authority seeking to have the claim
allowed as a priority claim pursuant to 11 U.S.C. § 507(a)(8)(C), in which case the
debt would not be discharged pursuant to 11 U.S.C.§ 523(a)(1)(A).[37]  More
importantly, the taxes withheld from employee pay are held in trust for the taxing
authority and do not belong to the employer:

> Federal law requires employers to withhold federal income taxes
> and social security taxes from employee wages and remit those

---

[34] Complaint, ECF 1, p. 9.

[35] Tr. 58, line 19.

[36] *See* Case No. 20-34576, ECF 234, Order Confirming Plan.

[37] 11 U.S.C.§ 523(a)(1)(A) provides that a discharge . . . does not discharge an individual debtor from any debt . . . for a tax . . . of the kind and for the periods specified in section . . . 507(a)(8) . . . whether or not a claim for such tax was filed or allowed."

taxes to the United States. 26 U.S.C. §§ 3102, 3402, 7501. The employer holds these taxes in trust for the United States. *See Slodov v. United States,* 436 U.S. 238, 243 (1978). These taxes are often referred to as "trust fund taxes." *Id.* The United States has no recourse against individual employees. Therefore, an employer who fails to remit the withheld taxes to the United States, is liable for the taxes which should have been paid. 26 U.S.C. § 6672(a).

> Section 6672(a) provides:
>
> [a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall ... be liable to a penalty equal to the total amount of tax evaded, or not collected, or not accounted for and paid over.
>
> 26 U.S.C. § 6672(a).
>
> Although, the employer will remain liable for the unpaid payroll taxes, its officers and agents may incur personal liability for the unpaid payroll taxes. *O'Connor v. United States,* 956 F.2d 48, 50 (4th Cir.1992). In order for an individual to be held personally liable under § 6672: "(1) the party assessed must be a person required to collect, truthfully account for, and pay over the tax, referred to as a 'responsible person'; and (2) the responsible person must have willfully failed to insure that the withholding taxes were paid." *Id.* at 50 (citing *United States v. Pomponio,* 635 F.2d 293 (4th Cir.1980)).

*In re Vaughn,* No. 09-08038-8-RDD, 2011 WL 5299700, at *4 (Bankr. E.D.N.C. Oct.

17, 2011), *aff'd sub nom. Vaughn v. I.R.S.,* No. 4:11-CV-222-FL, 2012 WL 3637141

(E.D.N.C. July 16, 2012).

To the extent that Wilkerson's trust fund liabilities to the Internal Revenue

Service and Virginia Department of Taxation remain unpaid, Wilkerson's liability

as the responsible person would be nondischargeable pursuant to 11

U.S.C.§ 523(a)(1)(A). DER, having no ownership interest in the withheld taxes nor

having a claim for contribution against Wilkerson as a result of having

subsequently paid them, has no claim against Wilkerson for those amounts.  For that reason, DER is not entitled to a judgment against Wilkerson in connection with those claims.

Having found that Wilkerson is liable to DER for breaching his fiduciary duty in connection with the diversion to himself of the Key Truck and Equipment proceeds in the amount of $133,000 and the $90,000 payment he received in January of 2019, the Court must now determine whether these debts may be discharged in Wilkerson's bankruptcy case.  Dixon contends that Wilkerson, as the manager of DER,  breached his fiduciary duties to DER and that his breaches constitute fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny, and willful and malicious injury to DER and, therefore, DER's claims against Wilkerson should be excluded from his bankruptcy discharge.[38]  As is the standard of proof in actions contesting the discharge of a debt, the Plaintiff bears the burden of proving that the debt is nondischargeable by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991).

Once the plaintiff makes a *prima facie* case, the burden of proof shifts to the debtor to offer credible evidence to satisfactorily explain his conduct.  *See Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249-50 (4th Cir. 1994) (holding the burden of proof shifts in actions under § 727); *see also Winston-Salem City Emps. Fed. Credit*

---

[38] 11 U.S.C.§ 523(a)((4) provides that "[a] discharge under . . . this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ."  11 U.S.C.§ 523(a)(6) contains a discharge exception for debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."

*Union v. Casper,* 466 B.R. 786, 793 (Bankr. M.D.N.C. 2012) (applying the burden

shifting framework to § 523(a)).  "The exceptions to discharge were not intended and

must not be allowed to swallow the general rule favoring discharge." *Arrow Concrete*

*Co. v. Bleam* (*In re Bleam*), 356 B.R. 642, 647 (Bankr. D.S.C. 2006) (quoting *Murphy*

*& Robinson Inv. Co. v. Cross* (*In re Cro*ss), 666 F.2d 873, 880 (5th Cir.1982)).  Thus,

exceptions to discharge are narrowly construed.

The *Bullock* analysis described by the Court in connection with the alleged

failure of Wilkerson to account for all the receivables owed by WST to DER,

including the elements necessary to establish fraud or defalcation while acting in a

fiduciary capacity for purposes of § 523(a)(4), is also applicable when considering

whether Wilkerson committed fraud or defalcation while acting in a fiduciary

capacity with respect to the $133,000 diversion and the $90,000 payment to himself.

The existence of an express trust and the requisite state of mind necessary to show

that Wilkerson was acting in a fiduciary capacity and committed defalcation must

be established by a preponderance of the evidence if those debts are to be excepted

from discharge.

The $133,000 taken by Wilkerson was in the form of a check made payable to

DER that he intentionally deposited into his personal bank account.  The Court has

determined that Wilkerson breached his fiduciary duty to DER under Virginia law

by diverting these funds to himself.  However, Dixon has not argued that Wilkerson

was subject to an express trust in connection with the $133,000 check at the time of

the diversion,[39] and whether Wilkerson had the requisite state of mind necessary to prove defalcation is unclear from his testimony.  If Dixon cannot prove both elements by a preponderance of the evidence, he cannot prevail on his allegation that Wilkerson committed defalcation while acting in a fiduciary capacity. Therefore, the Court will consider whether the evidence is sufficient to establish that Wilkerson embezzled the $133,000 or committed larceny.

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. The elements for embezzlement are (1) debtor's appropriation of property for debtor's benefit, and (2) appropriation with fraudulent intent or by deceit.'" *The Credit Experts, LLC. v. Santos* (*In re Santos*), Case No. 11-17789-BFK, 2012 WL 2564366, *6 (Bankr. E.D. Va. July 2, 2012) (citations omitted).

"Larceny is the 'fraudulent or wrongful taking and carrying away of the property to the taker's use without the consent of the owner.' *Johnson v. Davis* (*In re Davis*)*,* 262 B.R.663, 672 (Bankr. E.D. Va. 2001) (quoting *4 Collier on Bankruptcy* at ¶ 523.10[2] ).  Embezzlement is distinguishable from larceny because the original acquisition of the property was lawful, or at least with the consent of the owner, unlike larceny, where there is a requirement that felonious intent exist at the time of the taking." *In re McKnew*, 270 B.R. 593, 631 (Bankr. E.D. Va. 2001). It is not necessary to show the debtor committed the wrongful acts while acting in a

---

[39] *See In re McKnew,* 270 B.R. 593, 629 (requiring existence of an express trust).

fiduciary capacity to prevail on a claim of nondischargeability due to embezzlement or larceny. *Id.*

The Court is satisfied that the first element necessary to establish embezzlement, appropriation of property for debtor's benefit, is present with respect to the $133,000 check. There is no question that Wilkerson deposited a check payable to DER for the sale proceeds of equipment owned by DER into his own personal bank account, and there is no credible evidence that the proceeds were used for anything other than Wilkerson's personal benefit. The second element, appropriation with fraudulent intent or by deceit, is a closer question.

Fraudulent intent "may be inferred from the debtor's actions and surrounding circumstances. *Id.* (citing *Moonan v. Bevilacqua (In re Bevilacqua),* 53 B.R. 331, 334 (Bankr. S.D.N.Y. 1985)); *see also In re Chwat,* 203 B.R. at 249). A plaintiff need not prove that the debtor acted with an intent to harm, but only whether there was an intent to convert. *Id.*

The evidence establishes that the $133,000 check was payable to DER and represented the proceeds from the sale of two trucks and two trailers that were owned and sold by DER. Wilkerson did not claim that he diverted the proceeds to himself to repay a loan that he made to DER; rather, he testified that he "most likely" used the proceeds to purchase timber for the combined businesses. Yet, he offered no evidence, such as bank records or deeds to real property that were acquired with the proceeds, to corroborate his testimony. Dixon's uncontroverted testimony was that he was neither asked permission nor was aware that Wilkerson

had diverted the check to himself.[40]  These facts and circumstances are sufficient to establish a prima facie case that the $133,000 was taken by Wilkerson with fraudulent intent or deceit.  Wilkerson has failed to offer any meaningful evidence in rebuttal.  For these reasons, the Court finds that Wilkerson converted the $133,000 with the intent to permanently deprive DER of the benefit and use of this money.  Thus, the facts and circumstances prove by a preponderance of the evidence that Wilkerson embezzled the $133,000.

Having found that Wilkerson embezzled the $133,000 check, the claim is excepted from Wilkerson's discharge pursuant to 11 U.S.C. § 523(a)(4).  Therefore, the Court need not address whether the misappropriation amounts to larceny or a willful and malicious injury to DER pursuant to 11 U.S.C. § 523(a)(6).

Turning to the $90,000 payment Wilkerson received in January 2019, Wilkerson claims that he was repaying himself a portion of funds he had lent to the business.  The evidence gleaned from DER's tax returns and financial statements corroborates Wilkerson's testimony and supports his contention that he was owed funds by DER in excess of the amount repaid at the time he received it.  Although the Court has found that Wilkerson breached his fiduciary duty by repaying himself the $90,000 when he did, the requisite state of mind required to except the claim from Wilkerson's discharge cannot be inferred from the facts and circumstances and has not been established by the evidence submitted by Dixon.  Causing DER to

---

[40] Tr. 31, lines 2-19.

repay himself a loan is not the same as misappropriating funds.  Without proof of

fraudulent intent or deceit, Dixon cannot establish the elements of § 523(a)(4).

Finally, the Court must determine whether the $90,000 claim should be

excepted from discharge "for willful and malicious injury by the debtor to another

entity or to the property of another entity" pursuant to 11 U.S.C. § 523(a)(6).  Judge

Harner, in *K & M Elec. Servs. v. Vito* (*In re Vito*), 598 B.R. 809, 825-26 (Bankr .D.

Md. 2019), summarized the criteria necessary to except a debt from discharge

pursuant to this provision.

> Courts interpret the terms "willful" and "malicious" as modifying
> the term "injury" in section 523(a)(6), thus, requiring an
> intentional injury and not simply an intentional act. *See,
> e.g.*, *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140
> L.Ed.2d 90 (1998); *Duncan v. Duncan (In re Duncan)*, 448 F.3d
> 725, 729–30 (4th Cir. 2006); *Ocean Equity Group, Inc. v. Wooten
> (In re Wooten)*, 423 B.R. 108, 128–29 (Bankr. E.D. Va. 2010).
> Courts do not, however, equate "malicious" with malice or ill
> will. *See, e.g.*, *Craig v. Corbin*, No. GJH-15-2656, 2016 WL
> 4082620, at *9 (D. Md. July 7, 2016).  Rather, courts generally
> have determined that a "deliberate or intentional" injury that is
> "wrongful and without cause or excuse" satisfies the willful and
> malicious standard set forth in section 523(a)(6).  *See, e.g.*, *First
> Nat'l Bank of Maryland v. Stanley (In re Stanley)*, 66 F.3d 664,
> 667 (4th Cir. 1995); *Wooten*, 423 B.R. at 128–129; *BB & T Co. of
> Virginia v. Powers (In re Powers)*, 227 B.R. 73, 76 (Bankr. E.D.
> Va. 1998).
> . . .
> Courts entertaining claims of economic injury under section
> 523(a)(6) typically require something more than the nonpayment
> of a debt.  *See, e.g.*, *Stanley*, 66 F.3d at 668 ("Although a person
> need not know that someone else has superior ownership rights
> in the property to be technically liable for the tort of
> conversion, *see id.* & n. 7, *St. Paul's* test for malice requires such
> knowledge on the debtor's part before discharge will be denied—
> in other words, the debtor must have engaged in a 'wrongful'
> conversion."); *Wooten*, 423 B.R. at 130 (noting that " 'simple
> breach of contract ..., even if intentional, would not give rise to

a § 523(a)(6) violation.' ") (citations omitted).  This threshold inquiry is necessary because otherwise every commercial obligation outstanding at the time a debtor filed for bankruptcy would be potentially nondischargeable under section 523(a)(6).  Such a sweeping approach contradicts the policy of construing exceptions to discharge narrowly.  It would, in turn, leave relatively few claims subject to the discharge.

598 B.R. 809, 825-26.

In this case, Dixon has failed to meet his burden of proving by a preponderance of the evidence that Wilkerson's transfer of $90,000 was willful and malicious as those terms are interpreted by the Fourth Circuit.  There is insufficient evidence that Wilkerson's transfer of the $90,000 to his personal bank account, despite doing so at a time when third party creditors were not being paid, was intended to cause injury to DER.  Having considered Wilkerson's testimony, as well as the attendant facts and circumstance,  the Court finds that to the extent that DER was injured by the withdrawal of operating funds, Wilkerson's repaying himself funds that he had previously lent to DER was not without cause or excuse.  Accordingly, the $90,000 debt owed by Wilkerson to DER will not be excepted from discharge pursuant to § 523(a)(6).

In addition to claiming compensatory damages and a finding that DER's claims against Wilkerson should be excepted from discharge, Dixon seeks an award of punitive damages.  "A prevailing plaintiff in a fraud claim may be entitled to punitive damages if there is a showing of 'actual malice, or such recklessness or negligence as to evidence a conscious disregard of the rights of others.' " *Glaser v. Hagen*, No. 14-cv-1726, 2016 WL 521454, at *2 (E.D. Va. Feb. 5,

36

2016) (quoting *Jordan v. Suave*, 247 S.E.2d 739, 741 (Va. 1978)). "Where this line of aggravation is to be drawn in fraud cases is of course a matter difficult of definition and application, but we read the Virginia cases as requiring an element of wantonness, or malice, or overreaching going beyond mere "shadiness" in commercial dealings." *Sit-Set, A.G. v. Universal Jet Exch., Inc.*, 747 F.2d 921, 928 (4th Cir. 1984) (citation omitted).

The Court has considered the circumstances involving the misappropriation of the $133,000 Key Truck and Equipment check by Wilkerson. Although Wilkerson believes he expended these funds to purchase timber for the logging operation, his failure to provide corroborating evidence has left him unable to overcome his liability for the debt and the presumption that he converted these funds to his own use. The Court concludes, however, that the evidence is insufficient to award punitive damages.

Although the Court has found that Wilkerson acted with fraudulent intent in connection with the misappropriation of the $133,000 check, Dixon offered no direct evidence of Wilkerson's state of mind at the time. "[E]ven in respect of tort claims having as essential elements 'fraudulent,' or 'false,' or 'malicious' states of mind, Virginia does not permit recovery of punitive damages except upon proof of a degree of aggravation in the critical state of mind above the threshold level required to establish liability for compensatory relief." *Sit-Set, A.G.*, 747 F.2d at 928. Despite the Court's finding that Wilkerson embezzled the $133,000 check, it appears that

Wilkerson was not motivated by malice towards DER.  Thus, Dixon's evidence does not establish the "degree of aggravation" necessary to award punitive damages.

Having determined that Wilkerson is indebted to DER and that some portion of the debt will be excepted from discharge, the Court now directs its attention to the current status of DER and the statutory duties of its owners to attend to its affairs.  As the Court previously pointed out,[41] Va. Code §13.1-1050.2 provides that "[t]he properties and affairs of a limited liability company whose existence has been canceled . . . shall pass automatically to its . . .  members . . . as trustees in liquidation.  The trustees shall then proceed to (i) collect the assets of the limited liability company; (ii) sell, convey, and dispose of such of its properties . . . (iii) pay, satisfy and discharge its liabilities and obligations; and (iv) do all other acts required to liquidate its business and affairs."  Having heard little, if any, concern from the parties about non-insider creditors, aside from the taxing authorities who have assigned personal liability to DER's members for unpaid tax withholding obligations, the Court feels compelled to remind Dixon (and Wilkerson) of these statutory obligations.

Dixon has taken it upon himself to pursue a derivative claim on behalf of DER against Wilkerson.  Whether he has taken further steps to dissolve DER pursuant to his statutory obligations is unknown to the Court, as is the current status of WST and BB&D.  Va. Code §13.1-1047 provides that the state circuit court "may decree dissolution of a limited liability company if it is not reasonably

---

[41] *See supra* note 21.

practicable to carry on the business in conformity with the articles of organization and any operating agreement." However, a member's duty to wind up the affairs of a limited liability company when appropriate is not contingent on a decree of dissolution being entered. With the State Court Action having apparently been abandoned by Dixon during Wilkerson's bankruptcy proceedings, there is no indication that any proceedings are underway to wind up the affairs of Dixon and Wilkerson's associated limited liability companies.

The Court expects Dixon to fulfill his statutory obligations for the benefit of DER's creditors. The parties are admonished to remember that the assets of DER, including any sums that may be recovered directly from Wilkerson or through his bankruptcy case, belong to the creditors of DER.

## Conclusion

For the foregoing reasons, the Court grants judgment in favor of DER in the amount of $133,000 against Wilkerson, which judgment is excepted from discharge pursuant to 11 U.S.C.§ 523(a)(4). The Court finds, for purposes of determining the amount owed by Wilkerson to DER in connection with DER's proof of claim in Wilkerson's underlying bankruptcy case, that Wilkerson is indebted to DER for an additional $90,000 for a total of $223,000.

On all other counts of the Complaint, the Court finds in favor of Wilkerson. Judgment shall be entered in favor of Wilkerson as to all other claims contained in Count I of the Complaint. Count II of the Complaint will be dismissed with prejudice.

A separate order shall be issued.

Signed: September 16, 2022

_____/s/ Keith L. Phillips_____
United States Bankruptcy Judge

Entered on Docket: September 16, 2022

Copies to:

William R. Baldwin, III
Meyer Baldwin Long & Moore LLP
5600 Grove Avenue
Richmond, VA 23226-2102

William F. Seymour, IV
FloranceGordonBrown, P.C.
901 East Cary Street, Suite 1900
Richmond, VA  23219

Ross C. Allen
Whiteford, Taylor, Preston PLC
1021 E. Cary St. Ste. 1700
Richmond, VA 23219

Robert A. Canfield
Canfield Wells, LLP
4124 E. Parham Road
Henrico, VA 23228

Lewis E. Wilkerson, Jr.
PO Box 270
Keysville, VA 23947